Jeffrey R. Groendal, Bar No. 254097
jgroendal@klinedinstlaw.com
KLINEDINST PC
777 S. Figueroa St., Suite 2800
Los Angeles, California 90017
(213) 607-2115/FAX (213) 406-1101

Ronald P. Schiller (*pro hac vice* motion to follow)
rschiller@hangley.com
Sharon F. McKee (*pro hac vice* motion to follow)
smckee@hangley.com
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6200/FAX (215) 568-0300

Attorneys for Plaintiff
ARCH SPECIALTY INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCH SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA,<br><br>Defendant. | Case No. 2:19-cv-6964<br><br>**COMPLAINT** |

1. In this insurance action, Arch Specialty Insurance Company ("Arch") seeks a declaration that the excess healthcare professional liability policies that it issued to the University of Southern California ("USC") include an Abuse or Molestation Exclusion, which bars claims otherwise covered under the underlying policies. Arch would not have issued its excess policy without this exclusion, and USC accepted this contract term. While USC had ample opportunity to object if it

believed that the Abuse or Molestation Exclusion had been included in error, for nearly two years USC never did until it realized that it was facing charges of abuse spanning decades. As the 2017-18 policy was expiring in May 2018, USC learned that the *Los Angeles Times* planned to run a story accusing USC of allowing Dr. George Tyndall to continue practicing as a gynecologist in the Student Health Center although Dr. Tyndall allegedly had been "accused repeatedly of misconduct toward young patients" over many years. Recognizing that lawsuits were sure to be filed in the wake of this story, USC's insurance broker Chivaroli & Associates, Inc. ("Chivaroli") suddenly contacted Arch and demanded on behalf of USC – without revealing the impending allegations about Dr. Tyndall – that Arch amend its policy to delete the Abuse or Molestation Exclusion. As the basis for its demand, Chivaroli asserted that the exclusion had been included by mutual mistake. This demand had no merit and the assertion was false: Arch did not agree to provide coverage for Abuse or Molestation claims, and USC accepted Arch's coverage on that basis. USC, through Chivaroli, has recently renewed its demand and has threatened to bring litigation if Arch does not capitulate. Because litigation is inevitable, Arch brings this action seeking declaratory relief.

2. Alternatively, in the event that the Abuse or Molestation Exclusion is not determined to be part of the policies and enforceable, Arch seeks rescission of its 2017-18 excess policy. When USC applied for the policy, USC failed to disclose, among other things, that it had forced Dr. Tyndall to resign after a USC investigation found in January 2017 that Dr. Tyndall had violated USC's policies on race and sexual harassment and failed to meet professional medical standards in his interactions with patients (which among other things, placed their health at risk). Despite USC's knowledge of complaints made against Dr. Tyndall by nurses, medical assistants, and patients, USC kept Arch in the dark. Had Arch known of

2

COMPLAINT

these material, serious allegations and the underwriting risks they presented, at a minimum, Arch would not have offered to provide insurance to USC on the same terms, and would have expressly excluded coverage for claims arising out of Dr. Tyndall's alleged conduct.

## JURISDICTION AND VENUE

3. Plaintiff Arch Specialty Insurance Company is an insurance company formed under the laws of the State of Missouri and has its principal place of business in Jersey City, New Jersey.

4. Defendant University of Southern California is a private corporation formed under the laws of California and has its principal place of business in Los Angeles, California.

5. This dispute concerns an insurance policy with a $10 million limit of liability for each of the two policy periods at issue.

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the dispute is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue in this district is appropriate because Defendant USC resides in this district and a substantial part of the events giving rise to this action occurred here. 28 U.S.C. § 1391(b).

8. Arch has not agreed to arbitrate this dispute.

## FACTUAL ALLEGATIONS

9. This action concerns excess healthcare professional liability coverage that Arch issued for the policy periods of July 1, 2016 to July 1, 2017 and July 1, 2017 to July 1, 2018. A true and correct copy of the 2016-17 Arch Policy at issue is

appended to this Complaint as Exhibit A; a true and correct copy of the 2017-18 Arch Policy is appended to this Complaint as Exhibit B.

10. Each of the Arch Policies provides insurance excess of $100 million in underlying coverage provided by several different insurance carriers.

### A. Background on Allegations regarding Dr. Tyndall

11. A dispute has arisen between USC and Arch regarding the Arch Policies due to allegations that have been made concerning Dr. George Tyndall, a physician who was employed by USC from approximately 1989 to June 30, 2017.

12. Dr. Tyndall practiced in the USC Student Health Center, primarily as a gynecologist.

13. In early June 2016, the USC Office of Equity and Diversity ("OED") opened an investigation into Dr. Tyndall after his colleague, nursing supervisor Cindy Gilbert, raised concerns over Dr. Tyndall's interactions with patients, reporting that some patients were so disturbed by his behavior during exams that they refused further appointments with him, and that Dr. Tyndall did full body scans without noting the fact in the patients' charts. OED conducted further interviews on June 15, 2016 with other nurses and medical assistants from the Student Health Center who were present during Dr. Tyndall's patient examinations; these witnesses alleged that Dr. Tyndall frequently made inappropriate comments during examinations that upset patients and resulted in patient complaints, that Dr. Tyndall commonly inserted one or two fingers into the patient's vaginal opening before inserting the speculum, that Dr. Tyndall conducted full body checks which he did not report in the patient's chart, and that Dr. Tyndall did not practice proper hygiene. They also expressed concern about Dr. Tyndall's practices with respect to advising patients about performing breast examinations.

14. At approximately the same time as the OED opened its 2016 investigation, the Interim Executive Director of the Student Health Center notified Dr. Tyndall that he had violated the Center's policies and procedures and Medical Staff Bylaws by, among other things, maintaining patient identifiable medical information (patient photographs) in his office.

15. On or about June 17, 2016 USC placed Dr. Tyndall on paid leave while the investigation proceeded.

16. This was not the first OED investigation into Dr. Tyndall's conduct. A complaint was made in 2013 that Dr. Tyndall made inappropriate sexual and racial comments, and that some students did not want to be seen by Dr. Tyndall because he made them uncomfortable. In January and April 2016, students reported several instances when Dr. Tyndall allegedly discriminated on the basis of race.

17. As part of the 2016 OED investigation, the co-directors of the USC Student Health Center engaged MDReview to evaluate the medical justifications that Dr. Tyndall offered to OED. MDReview conducted further interviews, which yielded allegations similar to those made in the June 2016 interviews. In its report, MDReview concluded that several of Dr. Tyndall's practices were not "within current standard of care" and that he "repeatedly exhibits behavior that is unprofessional, inappropriate, and/or unusual." The report noted that "a number of significant concerns exist that would raise serious questions about patient physical and psychological safety were Dr. Tyndall to return to practice," including gaps in his "knowledge, clinical judgment, and adherence to current accepted practice guidelines regarding women's health," and failure to follow "current basic fundamentals of hygiene and infection control practices."

18. On January 31, 2017, OED issued reports on its investigation that concluded that Dr. Tyndall had violated USC's policies on sexual and race

harassment. The OED's conclusions were not disclosed to Arch or the public.

19. USC did not allow Dr. Tyndall to return to work after the OED reports were issued.

20. USC has stated that "[a]t the conclusion of the investigation by OED and Compliance in 2017, the university began termination proceedings." *See* "Summary of Coordinated Investigation of Student Health Physician," *available at* https://pressroom.usc.edu/files/2018/05/Summary-fact-sheet_5.15.18.pdf.

21. On or about May 16, 2017, USC told Dr. Tyndall that USC was terminating his employment.

22. On or about June 23, 2017, USC presented Dr. Tyndall with a severance agreement, which Dr. Tyndall subsequently accepted. Under this agreement, Dr. Tyndall's employment ended effective June 30, 2017. This is one day *before* the inception of the Arch Policy under which USC has submitted claims arising from Dr. Tyndall's conduct.

23. USC did not disclose Dr. Tyndall's termination or the reasons for it to the public or to Arch.

24. USC has stated that when Dr. Tyndall was terminated he said that he was retiring from the practice of medicine. However, when Dr. Tyndall sought reinstatement to USC in early 2018, USC filed a complaint regarding Dr. Tyndall with the Medical Board of California, alleging unprofessional conduct.

25. On or before May 8, 2018, USC learned that the *Los Angeles Times* planned to publish an article concerning allegations made against Dr. Tyndall. On May 15, the eve of publication, USC issued its first statements concerning the matter to the public. Within days, the first lawsuits were filed by Dr. Tyndall's former patients against him and USC, alleging sexual assault and battery, discrimination, and numerous other torts and statutory violations.

6
COMPLAINT

B.   **USC Application for Excess Healthcare Professional Liability Coverage from Arch**

26.   Upon information and belief, USC has purchased healthcare professional liability insurance coverage since at least 2013.  This has consisted of a primary policy underwritten by BETA Risk Management Authority ("BETA"), and several excess policies underwritten by other carriers.

27.   USC was represented in negotiations for healthcare professional liability insurance by Chivaroli, a highly experienced insurance brokerage firm.

28.   Before 2016, USC, through Chivaroli, solicited and received quotations for excess coverage from Arch, but USC chose not to accept Arch's offers.

29.   On June 1, 2016, Chivaroli again asked Arch to provide USC with a quotation for claims-made excess healthcare entity professional liability insurance coverage for the policy period of July 1, 2016 to July 1, 2017 (the "2016-17 Policy Period").

30.   The BETA Policy that was issued to USC for the 2016-17 Policy Period included some coverage for claims arising out of discrimination or sexual abuse, assault, battery, harassment or molestation.

31.   On June 1, 2016, Arch provided Chivaroli with a quotation for healthcare excess liability insurance.  This quotation enumerated the forms that would comprise the 2016-17 Arch Policy, including Policy Form Number 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form.

32.   This form has several exclusions, including 1. Abuse or Molestation, which states:

> This insurance does not apply to any "claim" or "loss" that alleges: . . . Injury or damage that in any way, in whole or in part, arises out of, relates to or results from "abuse or molestation".

7
COMPLAINT

1 (*See* Exs. A & B, form 02 HUE0002 00 02 07, § VII.1.)

2     33.    Policy Form Number 02 HUE0002 00 02 07 Healthcare Excess

3 Liability Coverage Form defines the term "abuse or molestation" as follows:

> "Abuse or molestation" includes but is not limited to any physical, mental, or moral harassment, assault or intimacy of a sexual nature even if consensual.

(*Id.* § VIII.1.)

    34.    Upon information and belief, Chivaroli was familiar with Arch healthcare excess professional liability forms, including the Healthcare Excess Liability Coverage Form containing the Abuse or Molestation Exclusion and other Arch-specific exclusions.

    35.    On July 27, 2016, USC, acting through Chivaroli, directed Arch to bind coverage effective July 1, 2016 in accordance with Arch's June 1, 2016 proposal, but as amended by USC. Although USC deleted several terms from Arch's proposal, USC did *not* delete the Healthcare Excess Liability Coverage Form or request an endorsement removing the Abuse or Molestation Exclusion or any other Arch-specific exclusion. While USC, through Chivaroli, asked Arch to provide sample language for its "Your Duties in the Event of Loss" form, USC did not request a copy of the Healthcare Excess Liability Coverage Form.

    36.    As a condition to binding coverage, Arch required that USC both confirm "there are no known batch related claims or incidents" and provide a warranty that it knew of no known loss.

    37.    On August 7, 2016, USC submitted a letter stating:

> In connection with the University of Southern California's Professional Liability Insurance program, this is to confirm that we have no knowledge of any claims, circumstances (including batch claims) occurring or made between July 1, 2016 and July 27, 2016 that might give rise to a claim under the additional / new excess layers secured effective July 1, 2016 . . . .

8
COMPLAINT

38. USC did not disclose that allegations had been made against Dr. Tyndall by nurses, medical assistants and patients, and that Dr. Tyndall had been placed on leave on or about June 17, 2016, during the OED investigation.

39. On July 27, 2016, USC's agent, Chivaroli, sent Arch the binders submitted by the underlying carriers. The binder submitted by one excess carrier, North American Capacity Insurance Company ("NACIC"), showed that NACIC was using its own 9-page "Follow Form Commercial Excess Liability Insurance Policy" form and had NACIC-specific exclusions.

40. On August 8, 2016, Arch sent Chivaroli its Binder of Insurance. The Binder listed the Arch policy forms that would make up the final policy, including Policy Form Number 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form.

41. In the cover email, Sherry Thompson of Arch asked Chivaroli to review the binder and advise Arch if the broker had any questions.

42. In its capacity as USC's broker, Chivaroli did not respond by questioning or disputing Arch's statement that Arch was binding coverage under Policy Form Number 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form.

43. On or about April 13, 2017, after the underlying carriers had issued their policies for the 2016-17 policy period, Arch sent Chivaroli its 2016-17 Policy for USC. In her cover email, Ms. Thompson asked Chivaroli to review the policy and advise Arch if there were any questions. The policy included form 02 HUE0002 00 02 07 and its Abuse or Molestation Exclusion.

44. On May 2, 2017, Chivaroli sent an email in response, in which Chivaroli made it clear that the broker had reviewed the Arch Policy on behalf of USC. The email stated:

> Thank you again for providing USC's excess professional liability policy issuance effective 01 July 2016. In review, I noticed that the revised reporting language as discussed in the attached e-mail with Nick [Williams] was not included. Could you please revise to incorporate accordingly?

The broker was referring to policy terms governing USC's and Arch's rights and duties with regard to reporting claims under the Arch Policy; the broker was not referring to any exclusions.

45. After reviewing the request, Arch agreed to make the change requested and on June 28, 2017 issued an endorsement entitled "Your Duties in the Event of an Accident, Occurrence, Medical Incident, Claim or Suit Change Endorsement," form number 06 HML0020 00 04 07.

46. No one at Chivaroli or USC questioned or disputed the fact that Arch used Policy Form Number 02 HUE0002 00 02 07 in the 2016-17 Arch Policy, or that it contained several Arch-specific exclusions, including the Abuse or Molestation Exclusion.

47. On or about May 1, 2017, Chivaroli, acting on USC's behalf, solicited a quotation from Arch for renewal of USC's excess professional liability insurance coverage program. Although USC had already received the 2016-17 Arch Policy containing the Abuse or Molestation Exclusion, and although USC knew that the 2017-18 BETA Policy would likely include certain discrimination and sexual abuse coverage, USC did not ask Arch to omit its Abuse or Molestation Exclusion from the 2017-18 Arch Policy.

48. On June 13, 2017, Arch submitted its proposal to Chivaroli. This proposal again stated that Arch would use its Healthcare Excess Liability Coverage Form.

49. On June 27, 2017, Chivaroli, acting on behalf of USC, directed Arch to

bind coverage for the 2017-18 policy period.

50. On June 28, 2017, Arch sent Chivaroli its Binder of Insurance for the 2017-18 renewal. The Binder stated that Arch was providing coverage under Policy Form Number 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form, *i.e.*, the same form used in the 2016-17 Arch Policy that USC and Chivaroli received on or about April 13, 2017.

51. In her June 28, 2017 email sending the Binder, Ms. Thompson advised Chivaroli that Arch was adding a new endorsement to all of its policies excluding liability for data breaches. But when Chivaroli objected to adding this new exclusion, Arch considered the merits of Chivaroli's argument and agreed to remove the new exclusion. On June 29, 2017, Arch issued a revised binder that omitted the data liability exclusion endorsement. The revised binder again stated that Arch was providing coverage under Policy Form Number 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form.

52. At no point during these discussions about the Binder for the 2017-18 Arch Policy did anyone from USC or Chivaroli object to using form 02 HUE0002 00 02 07 or ask that the Abuse or Molestation Exclusion be removed.

53. By the time that Chivaroli, on USC's behalf, solicited the quotation from Arch, USC had completed its investigation of the allegations against Dr. Tyndall, had found that he had violated USC's race and sexual harassment policies in response to complaints of patient harm, and upon information and belief had decided to terminate Dr. Tyndall. By the time that Chivaroli directed Arch to bind coverage, USC had told Dr. Tyndall that his employment was being terminated and had presented him with a severance agreement.

54. Upon information and belief, at all times relevant hereto, USC believed that if the allegations of improper medical care and of sexual and racial harassment

over multiple years were to be disclosed to the public that Dr. Tyndall and USC would be sued by former patients.

55. When USC applied to Arch to renew the excess policy for the 2017-18 policy period, USC failed to disclose any of the foregoing facts and allegations regarding Dr. Tyndall to Arch.

56. USC knew that the allegations made against Dr. Tyndall would be material to all of the insurers to which USC applied for healthcare professional liability coverage, including Arch.

57. USC knew that it was applying for healthcare professional liability coverage on a claims-made basis and therefore incidents that had happened in previous years would be relevant to an insurer that was evaluating the risk that a claim would be presented in the 2017-18 policy period.

58. Had USC disclosed the facts and allegations regarding Dr. Tyndall, at a minimum, Arch would not have offered insurance coverage on the terms that it did. Notwithstanding the fact that the Arch Policy contains the Abuse or Molestation Exclusion, Arch would have further protected itself against exposure to this risk by excluding coverage for Tyndall-related claims. The allegations regarding Dr. Tyndall were material to the risk that Arch was undertaking in providing excess healthcare professional liability coverage.

59. Because USC did not disclose any information concerning the allegations to the public until May 16, 2018, Arch could not have independently discovered the risk that the allegations made against Dr. Tyndall were likely to result in claims against both Dr. Tyndall and USC.

60. On May 16, 2018, the *Los Angeles Times* published an article that alleged that USC had allowed Dr. Tyndall to continue practicing in the Student Health Center as a gynecologist "although he had been accused repeatedly of

misconduct toward young patients." *See* Harriet Ryan, Matt Hamilton, Paul Pringle, "A USC Doctor Was Accused of Bad Behavior with Young Women for Years. The University Let Him Continue Treating Students," *Los Angeles Times*, 16 May 2018, *available at* https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html. The day before the story came out, USC issued statements disclosing that the 2016 investigation by USC "concluded that Tyndall had violated the university's policy on harassment by making repeated racially discriminatory and sexually inappropriate remarks during patient encounters," and that USC therefore began termination proceedings against Dr. Tyndall. *See* "Summary of Coordinated Investigation of Student Health Physician," *available at* https://pressroom.usc.edu/files/2018/05/Summary-fact-sheet_5.15.18.pdf.

61. On or before May 8, 2018, USC learned of the impending *Los Angeles Times* story.

62. Upon information and belief, on or before May 8, 2018, USC told Chivaroli about the substance of the impending *Los Angeles Times* story and/or the allegations made against Dr. Tyndall.

63. USC and Chivaroli realized that USC would certainly be sued by Dr. Tyndall's former patients once the Tyndall allegations became public.

64. USC and Chivaroli also knew or believed that coverage would not be available under the Arch Policies due to their Abuse or Molestation Exclusion.

65. On or about May 9, 2018, Chivaroli sent an email to Nicholas Williams and Ms. Thompson at Arch, in which the broker asserted:

> As you are also aware, we are working to finalize the policy issuances in connection with the 2017-2018 program. As such, we were reviewing the 2016-2017 policy documents as a point of comparison to the current term and noticed that the ARCH policy was not issued on a follow-form basis as is the case with all other participants on the tower. Could you please amend ARCH's 2016-2017 policy accordingly as well as notate the file in preparation of the 2017-2018 issuance?

13
COMPLAINT

USC and Chivaroli did not disclose to Arch then or in the following weeks that accusations of sexual misconduct by Dr. Tyndall had been made would soon become public.

66. On May 15, 2018, Mr. Williams responded to Chivaroli that the Arch Policy "looks like it is issued on our follow form excess policy language. As most excess carriers, it does contain some standard Arch language / exclusions." Mr. Williams added, "Alternately, if you are looking for a true 'short form' follow form, we will need to discuss and understand the other underlying carriers' approach."

67. On May 22, 2018, Mr. Williams advised Chivaroli that Arch was not prepared to rebind/reissue the 2016-17 and 2017-18 Arch Policies, and asked whether "there are any specific terms under the previous policy that is causing issues?"

68. In response, Chivaroli, on behalf of USC, asked that the Abuse or Molestation Exclusion be removed by manuscript endorsement. Chivaroli still did not tell Arch about the allegations regarding Dr. Tyndall, which were now public and had triggered five lawsuits against USC by former patients.

69. On May 25, 2018 Arch responded that it was prepared to remove the Abuse or Molestation Exclusion from the expired and expiring policies on the condition that USC provided a letter warrantying that USC was not aware of any known or unreported claim of abuse.

70. Only after Arch requested the warranty did USC disclose to Arch, through Chivaroli, that claims were being made that Dr. Tyndall had abused or molested patients.

71. After reviewing the underwriting file and considering the arguments that Chivaroli made, on USC's behalf, in favor of reformation, Arch concluded that

Arch had purposely included the Abuse or Molestation Exclusion and Arch declined USC's demand that Arch delete the Abuse or Molestation Exclusion from the 2016-17 and 2017-18 Arch Policies.

72. Since the *Los Angeles Times* story broke in May 2018, hundreds of plaintiffs have filed lawsuits against Dr. Tyndall and USC.

73. USC seeks coverage from Arch for the lawsuits arising from the allegations about Dr. Tyndall's conduct from its healthcare professional liability carriers under the policies issued for the 2017-18 policy period.

74. In late March 2019, Chivaroli again demanded that Arch agree to reform its policy, threatening litigation if Arch declined. According to Chivaroli, it made this demand on behalf of USC.

75. Arch does not agree with USC/Chivaroli's contention that the Abuse or Molestation was included in the Arch Policy due to the parties' mutual mistake. On the contrary, Arch only offered to provide excess coverage under the terms of its 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form and the exclusions set forth there, including the Abuse or Molestation Exclusion. USC accepted that offer and cannot now rewrite the contract it made and demand coverage for its known losses.

## COUNT I

### DECLARATORY JUDGMENT

76. Arch incorporates the allegations of the foregoing Paragraphs of this Complaint.

77. USC has demanded that Arch reform the Arch Policies, contending that the Abuse or Molestation Exclusion was included by mutual mistake.

78. USC's contention is without merit.

79. Arch offered to provide excess healthcare professional liability

coverage under the terms set forth in Arch's 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form, among other forms and endorsements.

80. When Arch made this offer, USC knew that Arch's 02 HUE0002 00 02 07 Healthcare Excess Liability Coverage Form included the Abuse or Molestation Exclusion.

81. Arch intentionally included the Abuse and Molestation Exclusion.

82. Arch would not have entered into the contract absent the Abuse or Molestation Exclusion.

83. USC accepted Arch's offer and directed Arch to bind coverage, which Arch did.

84. USC never raised any objection to Arch's policy forms or the Abuse or Molestation Exclusion until after USC realized that it would soon be sued in connection with the alleged misconduct of Dr. Tyndall.

## COUNT II

## RESCISSION

85. Arch incorporates the allegations of the foregoing Paragraphs of this Complaint.

86. USC, in applying for healthcare professional liability insurance from Arch, had a duty to disclose all facts material to the risk that USC asked Arch to undertake.

87. The allegations of unprofessional conduct and resulting harm made by multiple professionals and patients against Dr. Tyndall, who had practiced as a gynecologist for USC for approximately 27 years, were material to the risk that USC was asking Arch to undertake for the policy period of July 1, 2017 to July 1, 2018.

88. Upon information and belief, when USC applied for the 2017-18 Arch Policy, USC believed that the allegations against Dr. Tyndall were likely to result in

claims against Dr. Tyndall and USC. USC gave sufficient credence to the allegations that on January 31, 2017 it found that Dr. Tyndall had violated USC's policies against race and sexual harassment, and USC terminated his employment on or about May 16, 2017.

89. USC provided its insurers, including Arch, with periodic reports of claims and incidents that might result in claims without limiting its reports to incidents potentially involving damages in excess of primary coverage.

90. Based on USC's reporting practices, Arch had no reason to believe that USC was omitting potential claims of the magnitude presented by the allegations against Dr. Tyndall.

91. USC did not disclose the allegation against Dr. Tyndall to Arch when it applied for the 2017-18 Arch Policy.

92. If Arch had known of the allegations against Dr. Tyndall, Arch would not have issued coverage on the same terms, and certainly would not have agreed to provide coverage for claims arising out of Dr. Tyndall's alleged misconduct, including any Abuse or Molestation claims as defined by the 2017-18 Arch Policy.

93. Arch is entitled to rescission of the 2017-18 Arch Policy pursuant to Section 330 *et seq.* of the California Insurance Code and/or common law.

94. Accordingly, in the event that the Court does not enter judgment in Arch's favor on Count I, the Court should enter an order declaring the 2017-18 Arch Policy void or voidable and granting Arch's request that the 2017-18 Arch Policy be rescinded.

WHEREFORE, Arch respectfully requests that this Court enter an order:

    a.    Declaring that the Arch Policies include the Abuse or Molestation exclusion and finding that USC is not entitled to reform the Arch Policies; or

b. Rescinding the 2017-18 Arch Policy; and

c. Awarding such further relief as the Court deems appropriate.

KLINEDINST PC

DATED: August 9, 2019   By: /s/ Jeffrey R. Groendal
　　　　　　　　　　　　　　　Jeffrey R. Groendal
　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　ARCH SPECIALTY INSURANCE COMPANY

Ronald P. Schiller
(application for pro hac vice admission to be submitted)
Sharon F. McKee
(application for pro hac vice admission to be submitted)

18
COMPLAINT