**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCH SPECIALTY INSURANCE COMPANY, | Case No.  19-cv-6964 DDP (ASx) |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION** |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, | [Dkt. 14] |
| Defendant. | |

Presently before the court is Defendant University of California ("USC" or "Defendant")'s Motion to Compel Arbitration.  (Dkt. 14.)  Having considered the submissions of the parties and heard oral argument, the court denies the motion and adopts the following order.

**I. BACKGROUND**

Plaintiff is Arch Specialty Insurance Company ("Arch" or "Plaintiff"), an insurance company formed in the state of Missouri with its principal place of business in

Jersey City, New Jersey.  (Dkt. 1, Compl. ¶ 3.)  Defendant is USC, a California private corporation with its principal place of business in Los Angeles, California.  (*Id*. ¶ 4.)  Arch issued USC excess healthcare professional liability insurance for two policy periods, July 1, 2016 to July 1, 2017 and July 1, 2017 to July 1, 2018.  (*Id*. ¶ 9; Dkts. 1-1 (Ex. A), 1-2 (Ex. B) (collectively, "Arch Policies")[1].)  "Each of the Arch Policies provides insurance excess of $100 million in underlying coverage provided by several different insurance carriers." (Compl. ¶ 10.)  USC's professional liability insurance coverage consists of "a primary policy underwritten by BETA Risk Management Authority ("BETA Policies"), and several excess policies underwritten by other carriers."  (*Id*. ¶ 26.)

The Arch Policies contain several exclusions.  Arch alleges that one such exclusion excludes claims arising out of abuse or molestation.  (*Id*. ¶ 32 ("Abuse or Molestation Exclusion").)  "On May 16, 2018, the *Los Angeles Times* published an article that alleged that USC ha[d] allowed [a USC doctor ("Dr. Tyndall")] to continue practicing in the Student Health Center as a gynecologist," despite being accused of sexual misconduct. (*Id*. ¶ 60.)  Arch alleges that when USC "learned of the impending" story, USC and its broker, Chivaroli, "realized that USC would certainly be sued by Dr. Tyndall's former patients once the Tyndall allegations became public."  (*Id*. ¶ 63.)  "USC and Chivaroli also knew or believed that coverage would not be available under the Arch Policies due to the[ ] Abuse or Molestation Exclusion."  (*Id*. ¶ 64.)  Arch alleges that, without telling Arch "about the allegations regarding Dr. Tyndall, which were [ ] public and had triggered five lawsuits against USC by former patients," USC demanded that Arch reform the Arch Policies by deleting the Abuse or Molestation Exclusion.  (*Id*. ¶ 68)

Arch alleges that "USC seeks coverage from Arch for the lawsuits arising from the allegations" of Dr. Tyndall's misconduct involving abuse and molestation.  (*Id*. ¶ 73.)

---

[1] Citations to "Arch Policies" refer to Dkt. 1-1.

Arch brings this declaratory relief action seeking a declaration that the Abuse or Molestation Exclusion is a term of the Arch Policies, or, in the alternative, rescission of the Arch Policies based on USC's failure to disclose allegations of abuse at the time USC applied for the Arch Policies. (*Id.* ¶¶ 76-94.)

USC presently moves to compel arbitration contending that the Arch Policies' "follow-form clause or following form clause" effectively incorporates the underlying BETA Policies' arbitration provision. (Dkt. 14, ("Mot.").) Arch opposes the motion to compel arbitration contending that no valid agreement to arbitrate exists because the arbitration provision in the underlying policy is inconsistent with language in the Arch Policies and, therefore, is not incorporated into the Arch Policies. (Dkt. 23, ("Opp.").)

The relevant policies are the Arch Policies, (Arch Policies), the Ironshore Policies (Dkt. 14-4 (collectively, "Ironshore Policies")),[2] and the BETA Policies (Dkt. 14-3, Motlagh Decl., Ex. 1 (hereinafter, "BETA Policies").) The provisions at the core of this dispute are the Arch Policies' follow-form clause, the Ironshore Policies' follow-form clause, and the BETA Policies' arbitration provision.

The Arch Policies' follow-form clause provides that, "[t]he provisions of the 'controlling underlying insurance' shown on the schedule of underlying insurance are incorporated as part of this coverage form except for . . . [(g)] *Any other provision inconsistent with this coverage form*, policy endorsements or Common Policy Conditions Endorsement." (Arch Policies, at 28-29 (emphasis added).) The Arch schedule of underlying insurance identifies Ironshore Insurance Ltd. as the underlying insurance. (Arch Policies, at 26.) The Ironshore Policies' follow-form clause provides that, "Insurer agrees to provide the Insured with insurance excess of the Underlying Insurance, and in

---

[2] A court may consider documents attached to the complaint or documents incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The parties do not dispute that the Ironshore Policies and the BETA Policies are incorporated by reference and that the court may consider the policies here.

conformance with the terms, conditions, limitations, exclusions, definitions and endorsements of the Primary Policy . . . ."  (Ironshore Policies, at 8.)  The Ironshore schedule of underlying insurance identifies the BETA Policies as the underlying insurance.  (Ironshore Policies, at 5.)  The BETA Policies, in turn, include an arbitration provision which provides, in relevant part: "All disputes in any way concerning, arising out of or relating to this Contract shall be submitted to binding arbitration, unless resolved through BETArma's internal dispute resolution procedure established by the BETA Council."  (BETA Policies, at 32.)  The arbitration provision also provides that "[b]efore requesting arbitration[,] a Member must complete BETArma's internal dispute resolution procedure established by the BETA Council."  (*Id.*)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA" or "Act") requires courts to enforce covered arbitration agreements according to their terms.  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412 (2019) (citing 9 U.S.C. § 2).  Importantly, "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted).  "The court's role under the Act is [ ] limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Kilgore v. KeyBank, Nat. Ass'n*, 673 F.3d 947, 955-56 (9th Cir. 2012), on reh'g en banc, 718 F.3d 1052 (9th Cir. 2013) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms."  *Id.*

The "party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue."  *Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).  "When determining whether a valid

contract to arbitrate exists, we apply ordinary state law principles that govern contract formation."  *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) (citing *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)).  When the court is satisfied that an agreement to arbitrate exists, the policy favoring arbitration comes into play and "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration."  *Lamps Plus*, 139 S. Ct. at 1418-19.

## III. DISCUSSION

### A.  Existence of a Valid Agreement to Arbitrate

The parties dispute the existence of an agreement to arbitrate.  As discussed above, USC contends that the Arch Policies incorporate a valid agreement to arbitrate because the "Arch policies follow the form of the [Ironshore Policies[3]] which follow the form of the BETA Policies."  (Mot. at 1-2.)  The BETA Policies, in turn, contain an arbitration provision providing that "all disputes in any way concerning, arising out of or relating to this Contract shall be submitted to binding arbitration . . . ."  (BETA Policies, at 34.)  USC argues that the follow-form clauses above incorporate the underlying BETA arbitration provision contained in the BETA Policies.

Arch argues that the Arch Policies' follow-form clause does not incorporate the underlying BETA Policies' arbitration provision because the follow-form clause expressly excludes any provisions of the underlying policy that are inconsistent with the Arch Policies.  (Opp. at 8-14.)  Arch argues that the BETA Policies' arbitration provision is inconsistent with two clauses in the Arch Policies: (1) the "Legal Action Against Us" clause; and (2) the "Service of Suit Endorsement." (*Id.* at 9-11 (citing BETA Policies, at 17, 14).)

---

[3] As set forth above, the Arch Policies identify Ironshore Insurance Ltd. as the controlling underlying insurance.  (Dkt. 1-1, at 26.)

5

Courts are guided by contract rules of construction when interpreting insurance contracts. *See Wells Fargo Bank v. California Ins. Guarantee Assn.*, 38 Cal. App. 4th 936, 942 (1995). "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." Cal. Civ. Code § 1639. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."[4] Cal. Civ. Code § 1638.

Follow-form provisions generally incorporate the terms and conditions of the underlying insurance, except for terms or conditions that are inconsistent with the excess insurance policy. *Wells Fargo*, 38 Cal. App. 4th at 940. "A 'following form' policy incorporates the terms and conditions of another carrier's policy and provides the same scope of coverage as the underlying policy." *Id.*

> A following form excess policy generally will contain the same basic provisions as the underlying policy, with the exception of those provisions that are inconsistent with the excess policy. Any inconsistency or conflict between the provisions of a following form excess policy and the provisions of an underlying primary policy is resolved by applying the provisions of the excess policy.

*Haering v. Topa Ins. Co.*, 244 Cal. App. 4th 725, 734-35 (2016).

The issue here is whether the arbitration provision in the BETA Policies is inconsistent or otherwise in conflict with the Arch Policies' Legal Action Against Us clause or the Service of Suit Endorsement.

---

[4] The parties do not contend that the language in the relevant polices is ambiguous nor do the parties put forth any reason for the court to consider evidence outside of the policies. *See* Cal. Civ. Pro. § 1856. As such, the court declines to consider any outside evidence submitted by the parties. The court further denies the Request for Leave to File Response to New Declaration. (Dkt. 37.)

1

### 1.  *Legal Action Against Us Clause*

Arch argues that the Legal Action Against Us clause "establishes that Arch and USC agreed to litigate their disputes in court."  (Opp. at 11:5-6.)  The Arch Policies' Legal Action Against Us clause states as follows:

> No *person or organization* has a right under this policy: [(a)] To join us as a party or otherwise bring us into a 'claim' or 'suit' asking for damages from an insured; or [(b)] To sue us on this policy unless all of its terms have been fully complied with. A *person or organization* may sue us to recover on a settlement agreed to by us or on a final judgment against an *insured* obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance.  An agreed settlement means a settlement and release of liability signed by us, the insured, and the claimant or the claimant's legal representative.

(Arch Policies, at 17 (emphasis added).)   Arch argues that the word "sue" in subsection (b) above is "intended to be understood [ ] in its ordinary and popular sense as a proceeding in a court of law." (Opp. at 10:17-19.)

The court need not determine whether the word "sue" above is intended as a suit in a court of law.  The above provision distinguishes between a person or organization and an insured under the Arch Policies.  This provision addresses Arch's attempt to control the circumstances upon which it may be subject to a claim or be liable to a third-party person or organization.  As such, it is not material to the agreements between Arch and its insured.

### 2.  *Service of Suit Endorsement*

Arch next argues that the BETA arbitration provision is inconsistent with the Arch Policies' Service of Suit Endorsement, particularly the language stating that "All matters arising under this Policy shall be determined in accordance with the law and practice of

such Court[.]"  (Opp. at 13:18-21 (quoting Arch Policies, at 14).)  In full, the Service of Suit Endorsement provides:

> In the event of the failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  *All matters arising under this Policy* shall be determined in accordance with the law and practice of such Court, provided that nothing shall prohibit the Insurer from removing any action, suit or proceeding to a United States District Court.  The Insurer shall abide by the final decision of such court or any appellate court in the event of an appeal.

(Arch Policies, at 14 (emphasis added).)   Arch argues that the Service of Suit Endorsement contemplates litigation and that mandating arbitration would "eviscerate important rights preserved by the service of suit provision, including the right to pursue claims in a court of law and select a forum."  (Opp. at 12:18-19.)

USC argues that Arch's argument—that the Service of Suit Endorsement is inconsistent with the BETA arbitration provision—is foreclosed by the California Supreme Court's decision in *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495 (2005), and cases that have since followed *Boghos*.  (Reply at 5-6.)  USC also argues that the Service of Suit Endorsement "expressly states that it only applies when USC files suit against Arch claiming that Arch failed to pay an amount due under the Arch Policies."  (*Id*. at 5:8-9.)  Therefore, according to USC, the "All matters arising under this Policy" language does not apply in this declaratory relief action.

In *Boghos*, the California Supreme Court reviewed the enforceability of an arbitration clause found in a disability insurance policy that also included a service-of-suit clause.  *Boghos*, 36 Cal. 4th at 495.  The arbitration clause at issue there read, in relevant part: "[Notwithstanding] any other item set[ ]forth herein, the parties hereby

8

agree that any dispute which arises shall be settled in Binding Arbitration." *Id.* at 500. The service of suit clause read, in relevant part: "In the event of the failure of [Insurer] to pay any amount claimed to be due under the insurance described herein, [Insurer] ha[s] agreed that, at the request of [Insured], they will submit to the jurisdiction of a court of competent jurisdiction within the United States." *Id.* at 500. The California Supreme Court concluded that the clauses could be read together because the arbitration clause had explicit language establishing priority between the clauses. *Id.* at 503-04 ("the first sentence of the arbitration clause ('[n]otwithstanding any other item set forth herein') explicitly requires [the arbitration clause] to be enforced even if other provisions, read in isolation, might seem to dictate a different result."). In addressing a second argument raised by the insurer, the Court further concluded that the arbitration agreement did not render the service-of-suit clause as mere surplusage because the service-of-suit clause required the insurer "to submit to the jurisdiction of United States courts in actions to compel arbitration or to enforce arbitral awards . . . ." *Id.* at 503.

Notably, *Boghos* involved a single insurance policy containing an arbitration clause with explicit language establishing priority of the arbitration clause over the service-of-suit clause. *Id.* at 504. Under those facts, the Court interpreted the contract to give full effect to the parties' intentions at the time of contracting and as such, concluded that there was no ambiguity between the clauses and that the arbitration clause was enforceable. *See id.* In contrast, here, the excess insurer's policy contains explicit language essentially establishing priority of the excess insurer's terms in the face of any inconsistency in the underlying policies' terms. (Arch Policies, at 28-29 ("The provisions of the 'controlling underlying insurance . . . are incorporated except for. . .[(g)] Any other provision inconsistent with this coverage form, policy endorsements or Common Policy Conditions Endorsement.").) The parties clearly intended for the Arch Policies' terms and conditions to take priority in the face of any inconsistency or conflict. Moreover, unlike in *Boghos*, here, at the first step of the analysis, there is no presumption in favor of

9

arbitration—USC must first establish that the parties have agreed to arbitrate. *See id*. at 502; *Ashbey*, 785 F.3d at 1323 ("party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate . . .").  Therefore, the court is not persuaded that *Boghos* controls the outcome here.

The underlying BETA arbitration provision provides, in relevant part:

> All disputes in any way concerning, arising, out of or relating to this Contract that shall be submitted to binding arbitration, unless resolved through BETArma's internal dispute resolution procedure established by the BETA Council. Before requesting arbitration a Member must complete BETArma's internal dispute resolution procedure established by the BETA Council. . . . BETArma and each Member waive the right to court remedies, including a jury trial.

(BETA Policies, at 32.)  The BETA arbitration provision mandates arbitration of *all disputes* and waives the parties' rights to court remedies.  In contrast, the Arch Service of Suit Endorsement's "All matters arising under this Policy" language appears to empower a court to deal with a whole world of disputes—not an arbitrator.  Because both clauses are written broadly and appear to each contemplate a different forum for "all disputes," the clauses are inconsistent and in conflict.

USC argues that there are many courts that have concluded that a service-of-suit clause and an arbitration agreement can be read together because the service-of-suit clause can be interpreted to allow a party to enforce arbitration.  *See, e.g.*, *Boghos*, 36 Cal. at 503; *NS Holdings LLC v. American International Group Inc.*, No. SACV 10-1132 DOC (JEMx), 2010 WL 4718895, at *2-3 (C.D. Cal. Nov. 15, 2010) (concluding that an arbitration clause and a service-of-suit clause found in the same contract were not inconsistent); *City of Anaheim v. Philadelphia Ins. Companies*, No. SACV1601940JLSDFMX, 2017 WL 5592894, at *3 (C.D. Cal. Sept. 14, 2017) (concluding that the service-of-suit clause did not supersede the arbitration clause); *Hart v. Orion Ins. Co.*, 453 F.2d 1358, 1361 (10th Cir. 1971) (finding no inconsistency with a service-of-suit clause and an arbitration

clause in the same policy).  However, none of those courts were confronted with a service-of-suit clause with similar language to the "All matters arising under this Policy" language included in the service-of-suit clause at issue here.  Moreover, the policies before those courts did not involve, as here, an excess insurer's policy explicitly requiring that its terms prevail over any inconsistency or conflict in the underlying policy's terms.  The Arch Policies' "All matters arising under this Policy" language cannot reasonably be interpreted to be limited to enforcing arbitration.

USC next argues that the Service of Suit Endorsement would continue to have real effect because it allows USC to sue Arch in a court of competent jurisdiction, and avoid arbitration, where Arch has failed to pay an amount claimed.  (Reply at 6-7 (citing *Oakley, Inc. v. Executive Risk Specialty Insurance Co.*, Civ. A. No. 10-1585, 2011 WL 13137931, at *3 (C.D. Cal. 2011) and *Lennar Corp. v. General Security Indemnity Co.*, No. G053418, 2017 WL 4294481, at *1 (Cal. Ct. App. Sept. 28, 2017)).  The court is not persuaded by this narrow reading of the Service of Suit Endorsement.  It is unlikely that the parties intended to make a special carve out for USC only, but subject Arch to arbitration in all other instances.

Arch next argues that incorporating the underlying arbitration provision would lead to absurd results.  (Opp. at 14-17.)  The BETA arbitration provision provides, as a condition precedent to arbitration, for the parties to submit to a mandatory internal dispute resolution procedure established by the BETA Council.  (BETA Policies, at 32 ("Before requesting arbitration a Member must complete BETArma's internal dispute resolution procedure established by the BEAT Council").)  The BETA Policies' arbitration provision would require Arch to submit to an internal dispute resolution procedure exclusively for BETA members, Arch would not have the right to select an arbitrator, and USC would have the right to select both arbitrators.  (*Id.*)  Arch argues that the arbitration provision is designed exclusively for members such as USC, and that

applying the arbitration provision would lead to "illogical and absurd" results. (Opp. at 17:28.)

USC argues that the entity BETA would not be involved in the disputes between Arch and USC. (*Id.* at 11:16-17.) USC also appears to argue that the BETA arbitration provision's requirement that the parties submit to a mandatory internal dispute resolution is a "voluntary mediation" allowing the parties to "simply have the option to mediate any dispute before submitting the dispute to binding arbitration." (Reply at 8:28, 10:2-3.) Further, USC argues that Arch "waived the opportunity to object to the informal processes set forth in the Binding Arbitration Provision when it filed this suit." (Reply at 9:14-15.)

The BETA arbitration provision is written for BETA members only. An arbitration agreement in a risk management pooling arrangement such as BETA is understandable. The collective members in a pooling arrangement such as BETA's would be inclined to reduce litigation expenses and would seek to expediate disputes through alternative dispute resolution mechanisms. Nonetheless, Arch, an excess insurer who is not a member of BETA, cannot participate in BETA's internal dispute resolution. USC urges the court to rewrite the arbitration provision in effect to essentially ignore the required internal resolution procedure and any other provision that is BETA specific. (Reply at 10 (citing *Heinhuis v. Venture Assocs., Inc.*, 959 F.2d 551 (5th Cir. 1992).) The court declines to do so. Under the totality of the circumstances, the BETA arbitration provision is inconsistent with the Arch Policies—there is no indication that the parties agreed to arbitrate through the follow-form clause here. *See, e.g., Lennar Corp. v. General Security Indemnity Co.*, No. G053418, 2017 WL 4294481 (Cal. Ct. App. Sept. 28, 2017) (concluding that under the totality of the circumstances, an excess insurer's follow-form clause did not incorporate an underlying arbitration provision from an Irish-based insurer requiring arbitration in London).

1
2
          In summary, the court concludes that the Arch Policies' follow-form clause does not incorporate the BETA Policies' arbitration provision.

3
**IV. CONCLUSION**

4
5
          The court concludes that no valid agreement to arbitrate exists between the parties.  The court denies USC's motion to compel arbitration.

6
**IT IS SO ORDERED.**

7

8
Dated:  July 20, 2020

9

10
                                    DEAN D. PREGERSON

11
                                  UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            13